## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

In re,

Sybil Smith Warren,

                                   Debtor.

Discover Bank, Issuer of the
Discover Card,

                                   Plaintiff,

v.

Sybil Smith Warren,

                                   Defendant.

C/A No. 11-06879-dd

Adv. Pro. No. 12-80002-dd

Chapter 7

**ORDER**

This adversary proceeding is before the Court on the amended complaint of the plaintiff, Discover Bank, Issuer of the Discover Card ("Plaintiff"), seeking a determination that a debt owed to it by defendant and debtor, Sybil Smith Warren ("Defendant"), is nondischargeable under 11 U.S.C. § 523(a)(2)(A).  Jurisdiction for this proceeding is premised upon 28 U.S.C. §§ 1334 and 157(a).  Venue is proper under 28 U.S.C. § 1409.  This adversary proceeding is a core proceeding.  28 U.S.C. § 157(b)(2)(I).

Defendant answered the amended complaint and counterclaimed for attorney fees and costs under 11 U.S.C. § 523(d).  A trial was held on August 29, 2013.  After careful consideration of the applicable law, arguments of counsel, and evidence submitted, the Court issues the following findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a), made applicable by Federal Rule of Bankruptcy Procedure 7052.[1]

---

[1] To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

## **FINDINGS OF FACT**

1.      Defendant is the debtor in the chapter 7 case underlying this adversary proceeding.

2.      Defendant filed her voluntary petition for relief under chapter 7 of the Bankruptcy Code on November 4, 2011.  Defendant's bankruptcy case is captioned *In re Sybil Smith Warren*, Case No. 11-06879-dd, and is pending before this Court.

3.      In 2004, Defendant submitted an application to Plaintiff for a credit card.  Pl.'s ex. 2.

4.      Plaintiff issued a Discover card to Defendant for her personal use pursuant to an account ending with the numbers 6016.

5.      Over the next seven years until her bankruptcy filing, Defendant used the card to purchase goods and services and for other authorized purposes.

6.      Defendant has two sons.  The older son is named Payton, and the younger son is named Paxton.  Payton and Paxton were both in their thirties in 2011.  Defendant testified she had a lot of problems with Paxton.  Trial Tr. p. 13.  Defendant also testified both of her sons worked at a grinding and sharpening business her husband purchased and her husband had told her "he was buying them a job."  Trial Tr. p. 19.  Additionally, Defendant indicated Paxton almost brought the business down during his first year.  *Id.* at 20.  When asked whether either son was disabled, Defendant responded "well, not physically, but --."  *Id.* at 19.  Defendant claimed neither son as a dependent on her bankruptcy schedules.  *Id.*

7.      Paxton was married in late September 2011.

8.      The specific charges Plaintiff asserts should be excepted from discharge consist of the following transactions Defendant conducted with her Discover card during the ninety days preceding her bankruptcy filing (collectively, referred to herein as the "Contested Charges"):

a.      On August 24, 2011, Defendant used her Discover card to make a $96.12 purchase at Talbots, a women's clothing retailer.[2]

b.      On August 30, 2011, Defendant made an $847.00 purchase at Physicians Plan Weight Loss using her Discover card.  Defendant saw a medical doctor there, received some vitamin B-12 injections, and purchased some other medications.  She does not know whether the medications were prescription medications.  She has health insurance, but her health insurance would not pay for the medicines and services she purchased.  Her family physician did not send her to Physicians Plan Weight Loss.  Trial Tr. pp. 42-43.

c.      Defendant made two purchases at Jos. A. Bank, which is a men's clothing retailer, on September 16, 2011, using her Discover card.  The purchases were in the amounts of $553.94 and $230.69.  One purchase consisted of a suit that was on sale, a shirt, a pair of dress shoes, and some socks for Payton to wear to Paxton's wedding.  The other purchase consisted of some socks and shoes for Paxton to wear to his wedding.  Trial Tr. pp. 39-40; Pl.'s Ex. 11.

d.      Defendant also purchased a blouse she wanted to wear to Paxton's wedding from Talbots on September 16, 2011, using her Discover Card.  The total for this purchase was $64.26.  Defendant remembered the blouse being on sale.  Trial Tr. pp. 41, 67; Pl.'s Ex. 12.

e.      On September 21, 2011, Defendant used her Discover card to satisfy an $828.52 obligation Paxton owed to Anderson Brothers Bank.  Defendant was not obligated or

---

[2] Plaintiff did not introduce any evidence regarding the nature of the goods purchased at Talbots on August 24, 2011.

liable on the debt Paxton owed.  She testified Paxton came to her house with a summons and said

he would be put in jail if she could not help him pay the debt.  Defendant testified Paxton's

father was out of town at the time, and she was afraid her son would go to prison, which is why

she paid the obligation.  The summons Paxton received was a summons issued by the Florence

County Magistrate Court and does not indicate anything about going to jail.  However,

Defendant may not have read the summons and instead relied upon what Paxton told her.  Trial

Tr. pp. 11-15; Pl.'s Exs. 9 and 10.

   f. Defendant used her Discover card on September 29, 2011, for a $119.00

purchase of a woman's belt at the J. Peterman Co., which is a vintage online clothing retailer.

Defendant purchased the belt for Paxton's wedding.  Trial Tr. pp. 23-24.

  9. Defendant made a $181.36 purchase at Schofield Hardware using her Discover

card on August 23, 2011.  The goods purchased might have been hunting and fishing supplies for

Paxton or an item for Defendant's house.  No receipt was introduced into evidence.[3]  Trial Tr.

pp. 43-44; Pl.'s Ex. 4.

  10. Defendant first contacted the attorney that eventually represented her in her

bankruptcy and this adversary proceeding at the end of September 2011.  Trial Tr. pp. 21-22.

Defendant first met with her attorney on September 30, 2011, when they discussed her options

under the circumstances.[4]  *Id*. at p. 46-47.  Defendant did not decide to file bankruptcy until after

she met with her attorney.  *Id*. at p. 46.

---

  [3] Plaintiff indicated during the trial that the Schofield Hardware purchase was a charge it
was contesting.  However, Plaintiff did not include this charge as a Contested Charge in its
proposed findings of fact and conclusions of law submitted after the trial.
  [4] Neither party addressed the discrepancy between the September 29, 2011 transaction
date for the $119.00 belt as reflected on the account statements, Defendant's testimony she wore
the belt to the wedding, and the testimony that she met with her attorney for the first time on
September 30, 2011.

11.    Defendant testified that after meeting with her attorney, she spoke with a long-time friend named Donald Purvis about lending the funds she needed to avoid filing bankruptcy, but he was unable to lend her the money.  Trial Tr. p. 47.  Mr. Purvis also testified that Defendant, between the time she first spoke with her bankruptcy attorney and when she filed bankruptcy, asked him for a loan.  *Id*. at pp. 80-81.  In addition, Defendant indicated her husband tried to gather the funds she needed, but he was unable to do so.  *Id*. at 47.

12.    Defendant started looking at debt consolidation or some other form of debt relief in 2010.  Trial Tr. p. 22.

13.    At the time Defendant made the Contested Charges, she had cut up and was attempting to pay off her other credit cards.  She was only using the Discover card.  Trial Tr. pp. 15, 62, 74.

14.    Between January 1st and July 6th of 2011, Defendant incurred charges of approximately $445.00 on her Discover card.  Between July 7th and September 29th of 2011, Defendant incurred charges of approximately $5,360.00, including the Contested Charges.  The last charge Defendant made prior to her bankruptcy filing was a $16.95 charge for obtaining her credit report on October 6, 2011.  Trial Tr. pp. 36, 63; Pl.'s Ex. 4.

15.    During the year preceding her bankruptcy, Defendant made numerous payments on her Discover card that exceeded the minimum payment required during a given month:

| Statement Closing Date | Payments and Credits | Minimum Payment Due |
|---|---|---|
| November 5, 2010 | $125.00 | $90.00 |
| December 5, 2010 | $125.00 | $90.00 |
| January 5, 2011 | $125.00 | $87.00 |
| February 5, 2011 | $125.00 | $85.00 |
| March 5, 2011 | $90.00 | $83.00 |
| April 5, 2011[5] | NONE | $82.00 |

---

[5] There are no payments on the account listed on the April 5, 2011 statement.  However, there are two $125.00 payments appearing on the May 5, 2011 statement.

| | | |
|---|---|---|
| May 5, 2011 | $250.00 | $188.00 |
| June 5, 2011 | $225.00 | $80.00 |
| July 5, 2011 | $475.73[6] | $86.00 |
| August 5, 2011 | $505.00 | $78.00 |
| September 5, 2011 | $624.00[7] | $82.00 |
| October 5, 2011 | $375.00 | $109.00 |
| November 5, 2011 | $736.00[8] | $159.00 |

Pl.'s Ex. 4.

16.     Included in the payments and credits on the November 5, 2011 statement was a $100.00 cash bonus Defendant received as part of a rewards program for using her Discover card.  Rather than apply the $100.00 toward the account balance, Defendant could have requested a check or gift card.  Trial Tr. pp. 49-50; Pl.'s Ex. 4.

17.     Defendant was charged a $25.00 late fee on her statement with an April 5, 2011 closing date.  The $188.00 minimum payment due on this statement included an $82.00 past due amount.  The statement with a November 5, 2011 closing date also reflects a $25.00 fee and that the minimum payment due includes a $59.00 past due amount.  It is not clear whether the $25.00 fee on this statement is a late fee.  Pl.'s ex. 4.

18.     Prior to June 5, 2011, Defendant's credit line was $10,700.00.  The statement with a June 5, 2011 closing date reflects an increase in her credit line to $11,800.00.  Pl.'s ex. 4.

19.     Defendant lists Plaintiff as holding an unsecured claim for $5,401.00 in her schedules filed in her bankruptcy.  Pl.'s Ex. 1.  Defendant's November 5, 2011 Discover card statement indicates a balance owed of $7,343.18.  Pl.'s Ex. 4.  This statement also reflects

---

[6] Out of the $475.73 in payments and credits on this statement, $350.73 was for goods returned to the J. Peterman Co.
[7] Out of the $624.00 in payments and credits on this statement, $299.00 was for goods returned to the Peruvian Connection.
[8] Out of the $736.00 in payments and credits on this statement, $636.00 was for goods returned to the J. Peterman Co.

Defendant had a cash advance credit line of $3,800.00 of which the full amount was available to her. *Id.*

20.     Besides the amount owed to Plaintiff, Defendant scheduled $34,288.00 in other credit card debt.  Pl.'s Ex. 1.

21.     Defendant scheduled her average monthly income at $2,776.37.  This income consisted of social security and retirement.  Pl.'s Ex. 1.

22.     Defendant scheduled $3,185.16 in average monthly expenses.  Pl.'s Ex. 1. Defendant testified it cost her at least $1,000.00 per month to service her credit card debt.  The average monthly expenses indicated on Defendant's schedule J do not include the $1,000.00 needed to service her credit card debt.  Trial Tr. p. 31.

23.     Defendant is married, but she and her husband have not been living together for seven or eight years.  Trial Tr. pp. 15-16.

24.     Prior to 2011, Defendant's husband supported her with between $1,500.00 and $2,000.00 per month.  Trial Tr. p. 16.  However, in early 2011, her husband lost a big client.  *Id.* Defendant indicated she did not know about her husband losing this client until late September 2011 after she made the Contested Charges when she asked him about the reduced support he was providing.  *Id.* at pp. 16, 22, 29.  Between the time when Defendant's husband lost the client in early 2011 and his telling Defendant about losing the client, Defendant testified he was giving her between $700 and $800 per month and paying an occasional bill for her such as her car insurance.  *Id.* at p. 27.  When asked by Plaintiff's counsel about the fact that she was receiving less money from her husband at the time she made the Contested Charges, Defendant responded: "Not significant -- not significantly less at this time, okay?  I wasn't -- he didn't want me to

know.  I wouldn't have gone out and bought the items that I bought.  I would have told him to handle it."  *Id.* at pp. 41-42.

25.    On her schedule I, Defendant indicated with regard to income from her non-filing spouse that her spouse maintained a separate household and that her "non-filing spouse [would] no longer be able to contribute to [her] expenses because of a decline in his business."  Pl.'s Ex. 1.  Defendant did not list any income from her husband in response to item 2 on her Statement of Financial Affairs, which directed her to list income other than from employment or operation of a business during the two years preceding the petition date.  *Id.*

26.    At her deposition prior to trial, Defendant testified as follows with regard to support she received from her husband:

> Q    How long had you been getting help from Mr. Warren?
> A    He had been helping me several years.
> Q    And about when did he lose that account that made it impossible for him to help you?
> A    He lost it in the first of the year 2011.
> Q    Okay.  So what sort of impact -- do you remember about how much that was he was helping you with?
> A    Sometimes fifteen hundred to two thousand a month, or he would pay a bill for me.
> Q    So that was a significant blow?
> A    Yeah, sure it was, yes.

Pl.'s Ex. 5, pp. 33-34.

27.    Defendant was 71 years old at the time of the trial in this adversary proceeding. Defendant's work and educational background is in accounting and bookkeeping.  She has a business degree and worked at the Clemson University research station in Florence, South Carolina for 33 years in a job that entailed "accounting, creating budgets, [and] making sure the research center's expenditures would not exceed their income."  Trial Tr. p. 20.  Following her work at the research station, Defendant did payroll and financial aid processing at some beauty

schools and then worked at her husband's certified public accounting firm until 2008.  *Id*. at pp. 20-21, 71.

28.     Defendant was retired and looking for work at the time she made the Contested Charges.  She did not have any job prospects at the time.  Trial Tr. p. 33.

29.     Defendant also had used up her savings of between $4,000 and $6,000 at the time she made the Contested Charges.  Trial Tr. p. 33.

30.     Defendant testified that she intended to pay her debt to Plaintiff at the time she made the Contested Charges.  Trial Tr. p. 73.

31.     Defendant also testified she understood Plaintiff always expected her to pay for the charges she made with her Discover card and responded "no" when asked whether she ever gave Plaintiff any reason to believe she would not pay for the charges.  Trial Tr. pp. 37-38.

32.     Plaintiff did not conduct a Federal Rule of Bankruptcy Procedure 2004 examination of Defendant prior to initiating this adversary proceeding.  At a 2004 examination, a party in interest may examine a debtor regarding "the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge."  Fed. R. Bankr. P. 2004(b).  Plaintiff also did not attend the 11 U.S.C. § 341 meeting of creditors.

33.     Plaintiff's initial complaint in this adversary proceeding contained little factual detail, aside from alleging that the balance owed on Defendant's Discover account was $7,343.18 as of the date she filed bankruptcy and that between August 12, 2011, and October 6, 2011, Defendant made retail charges of $4,874.00.  Notably, the initial complaint did not allege luxury goods were purchased or invoke the presumption of nondischargeability for luxury goods under section 11 U.S.C. 523(a)(2)(C).  No statements or exhibits were attached to the initial

complaint.  This Court granted Defendant's motion to dismiss the initial complaint and gave Plaintiff ten days to file an amended complaint.

34.     Plaintiff filed an amended complaint in which it sought a determination that $4,036.00 in charges Defendant made between August 12, 2011, and October 6, 2011, was nondischargeable.   The amended complaint contained more factual detail and alleged luxury goods were purchased.  It contained a list of retailers from which Defendant allegedly purchased luxury goods, including Jos. A. Bank and J. Peterman Co., but did not indicate what goods actually were purchased from these retailers, which also presumably sell non-luxury goods.  This list also included Target.  This Court dismissed Plaintiff's amended complaint for failure to state a claim upon which relief could be granted, and Plaintiff appealed.  The United States District Court for the District of South Carolina reversed the dismissal and remanded the case.  After conducting discovery, Plaintiff sought a determination at trial excepting the approximately $2,740.00 in Contested Charges from discharge.

35.     The attorney who represented Plaintiff during the pleadings stage of this case was different than the attorney representing it at trial.

## CONCLUSIONS OF LAW

A central purpose of the Bankruptcy Code "is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'"  *Grogan v. Garner*, 498 U.S. 279, 286 (1991) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)).  However, the Bankruptcy Code "limits the opportunity for a completely unencumbered new beginning to the 'honest but unfortunate

debtor.'" *Id.* at 286-87 (quoting *Hunt*, 292 U.S. at 244). Section 523(a) of the Bankruptcy Code

sets forth certain kinds of obligations that Congress deems to be nondischargeable. *Id.* at 280-81.

In addressing exceptions to discharge, courts "traditionally interpret the exceptions narrowly to

protect the purpose of providing debtors a fresh start" but "are equally concerned with ensuring

that perpetrators of fraud are not allowed to hide behind the skirts of the Bankruptcy Code."

*Foley & Lardner v. Biondo* (*In re Biondo*), 180 F.3d 126, 130 (4th Cir. 1999).

## A. 11 U.S.C. § 523(a)(2)(A)

Under 11 U.S.C. § 523(a)(2)(A), debts "for money, property, services, or an extension,

renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false

representation, or actual fraud, other than a statement respecting the debtor's or an insider's

financial condition" are not dischargeable. "[F]alse pretenses, a false representation, or actual

fraud" are "common-law terms, and . . . they imply elements that the common law has defined

them to include." *Field v. Mans*, 516 U.S. 59, 69 (1995). At the time section 523(a)(2)(A) was

enacted in 1978 and now, "the most widely accepted distillation of the common law of torts was

the Restatement (Second) of Torts (1976), published shortly before Congress passed the [1978

Bankruptcy Reform] Act." *Id* at 70. Likewise, the Fourth Circuit has referred to the

Restatement in defining what a plaintiff must show under section 523(a)(2)(A). *See Biondo*, 180

F.3d at 134. To prevail under section 523(a)(2)(A), "a plaintiff must prove four elements: (1) a

fraudulent misrepresentation; (2) that induces another to act or refrain from acting; (3) causing

harm to the plaintiff; and (4) the plaintiff's justifiable reliance on the misrepresentation."[9] *Id.*

---

[9] The Fourth Circuit has set forth these elements differently since *Biondo*. *See SG Homes Assoc., LP v. Marinucci*, 718 F.3d 327, 334 (4th Cir. 2013) ("A plaintiff's proof of fraud under [section 523(a)(2)(A)] requires satisfaction of the elements of common law fraud: '(1) false representation, (2) knowledge that the representation was false, (3) intent to deceive, (4) justifiable reliance on the representation, and (5) proximate cause of damages.'" (quoting

*1. Presumption of nondischargeability*

As the party asserting a debt owed to it is nondischargeable, Plaintiff bears the burden of proof, which is by a preponderance of the evidence.  *Grogan*, 498 U.S. at 291.  However, section 523(a)(2)(C) provides that for purposes of section 523(a)(2)(A), "consumer debts owed to a single creditor and aggregating more than $650 for luxury goods or services incurred by an individual debtor on or within 90 days before the order for relief under this title are presumed to be nondischargeable."  "Section 523(a)(2)(C) was enacted primarily to deal with the situation in which a debtor 'loads up' with debt by going on a buying or spending spree in contemplation of bankruptcy."  *MBNA Am. v. Simos* (*In re Simos*), 209 B.R. 188, 195 (Bankr. M.D.N.C. 1997).  As for the effect of a presumption, "[i]n a civil case, unless a federal statute or [the Federal Rules of Evidence] provide otherwise, the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption.  But this rule does not shift the burden of persuasion, which remains on the party who had it originally."  Fed. R. Evid. 301, made applicable by Fed. R. Bankr. P. 9017; *see also Devan v. CIT Group/Commercial Serv., Inc.* (*In re Merry-Go-Round Enter., Inc.*, 229 B.R. 337, 341 (Bankr. D. Md. 1999).  The "bursting bubble"

---

*Nunnery v. Rountree* (*In re Rountree*), 478 F.3d 215, 218 (4th Cir. 2007)).  The difference between how the elements of section 523(a)(2)(A) are stated in *Biondo* as opposed to subsequent cases is largely without substance.  The first element under *Biondo* encompasses elements one and two as stated in cases after *Biondo*.  *See* Restatement (Second) of Torts § 526 (1977) ("A misrepresentation is fraudulent if the maker (a) knows or believes that the matter is not as he represents it to be, (b) does not have the confidence in the accuracy of his representation that he states or implies, or (c) knows that he does not have the basis for his representation that he states or implies.").  Moreover, an argument that the maker of a misrepresentation did not intend to deceive the recipient is akin to asserting the maker did not intend to induce the recipient to act or refrain from acting, which is the second element of the test under *Biondo*.  *See Biondo*, 180 F.3d at 134.  The fifth element of a section 523(a)(2)(A) claim as set forth in cases after *Biondo*, which is proximate cause of damages, can be a source of confusion because it may lead a debtor to argue that a misrepresentation did not proximately cause any damage since he or she could not have paid the debt at issue anyway.  *See id.* at 135.  However, "[i]t is axiomatic that in the context of a claim for exception to discharge under § 523(a)(2)(A), the harm or damage is the provision of credit."  *Id.*

theory has been the "most widely followed theory of presumptions in American law."  2 Kenneth

S. Broun, *McCormick on Evidence* § 344 (7th ed.).  Under the bursting bubble theory, "the only

effect of a presumption is to shift the burden of producing evidence with regard to the presumed

fact.  If that evidence is produced by the adversary, the presumption is spent and disappears."  *Id*;

*see also Richmond Sand & Gravel Corp. v. Tidewater Constr. Corp.*, 170 F.2d 392, 393-94 (4th

Cir. 1948).  The parties have stipulated the debt Defendant owes to Plaintiff is a consumer debt

under 11 U.S.C. § 101(8).  Additionally, all of the Contested Charges occurred within 90 days of

Defendant filing bankruptcy.

As for what constitutes a luxury good or service for purposes of section 523(a)(2)(C),

"the term 'luxury goods or services' does not include goods or services reasonably necessary for

the support and maintenance of the debtor or a dependent of the debtor."   11 U.S.C. §

523(a)(2)(C)(ii)(II).   In determining if an item is a luxury good, courts generally consider

"whether under the circumstances the purchases were extravagant, indulgent, or nonessential."

*Hudson Belk Co. v. Williams* (*In re Williams*), 106 B.R. 87, 89 (Bankr. E.D.N.C. 1989) (citing

*Sears Roebuck & Co. v. Faulk* (*In re Faulk*), 69 B.R. 743, 751 (Bankr. N.D. Ind. 1986); *First

Sec. Bank of Idaho v. Davis* (*In re Davis*), 56 B.R. 120, 121-22 (Bankr. D. Mont. 1985)).  "Other

factors have included whether the items purchased served any important family function and

evidenced some fiscal responsibility."  *Id*.  An example of a purchase that serves an important

family function and evidences some fiscal responsibility is the purchase of a pre-owned van for

use by a debtor and his or her family.  *See Davis*, 56 B.R. at 122.  Items purchased as gifts for

family members are often considered luxury items.  *See Cong. Fed. Credit Union v. Pusateri* (*In

re Pusateri*), 432 B.R. 181, 202 (Bankr. W.D.N.C. 2010); *GE Money Bank v. Riccardi* (*In re*

*Riccardi*), Bankr. No. 05-03316-5-ATS, Adv. No. S-05-00154-5-AP, 2006 WL 6938447, at *1-*2 (Bankr. E.D.N.C. June 30, 2006); *Hudson Belk Co. v. Williams*, 106 B.R. at 89.

Even though Defendant may have viewed the $784.63 in dress clothes she purchased for her sons at Jos. A. Bank as essential items for Paxton's wedding, these items were gifts for her sons and luxury items for purposes of section 523(a)(2)(C), considering that both sons were over age 30 and not dependents of Defendant. Similarly, the $828.52 obligation Paxton owed to Anderson Brothers Bank that Defendant paid on Paxton's behalf is a luxury good or service under section 523(a)(2)(C) because it was a gift of a nonessential nature to a son who was over age 30 and not Defendant's dependent. The purchase of the $119.00 belt from J. Peterman Co. was also a luxury good because while a belt is a good reasonably necessary for Defendant's support and maintenance, a $119.00 belt is not. The purchases at Talbots and Physicians Plan Weight Loss constitute closer questions. However, the Court need not resolve the question of whether these items are luxury goods because even assuming all of the Contested Charges were for luxury goods or services, the Court finds the presumption rebutted for reasons stated subsequently in this Order.

### 2. Fraudulent misrepresentation

With respect to the elements that must be proven for a debt to be deemed nondischargeable, the parties stipulated that by accepting an extension of credit from Plaintiff and incurring charges on her Discover account, Defendant represented an intention to repay the amounts charged.[10] *See AT&T Universal Card Serv. v. Mercer* (*In re Mercer*), 246 F.3d 391,

---

[10] Some courts have defined the representation a person makes when using a credit card as a representation of intent and ability to repay the charges incurred. *See generally* Elizabeth Lea Black, Annotation, *Credit Card Debt as Nondischargeable under Bankruptcy Code Provisions Concerning Nondischargeability of Individual Debt Obtained Through False Pretenses, False Representation, or Actual Fraud, Other Than Statement Respecting Debtor's or*

404-05 (5th Cir. 2001) (en banc); *Rembert v. AT&T Universal Card Serv.* (*In re Rembert*), 141

F.3d 277, 281 (6th Cir. 1998); *Anastas v. Am. Sav. Bank* (*In re Anastas*), 94 F.3d 1280, 1285 (9th

Cir. 1996).   While the parties have characterized the representation as an intention to repay, in

order to avoid confusion because intent to deceive or to induce reliance is a separate element that

must be proven under section 523(a)(2)(A), this representation can also be characterized as a

promise to repay the charges incurred.[11]   Characterizing the representation as a promise to pay is

also consistent with the cardmember agreement for Defendant's account, which states the

following under the heading "**MAKING PAYMENTS**:"

> **Promise to Pay.**   You agree to pay us in U.S. dollars for all purchases, cash
> advances and balance transfers including applicable Interest Charges and other
> charges or fees, incurred by you or anyone you authorize or permit to use your
> Account or a Card, even if you do not notify us that others are using your Account
> or a Card.

---

*Insider's Financial Condition (11 U.S.C. § 523(a)(2)(A))*, 158 A.L.R. Fed. 189 (1999).   Other
courts have concluded that use of a credit card constitutes no representation at all.   *See AT&T
Universal Card Serv. v. Alvi* (*In re Alvi*), 191 B.R. 724, 731 (Bankr. N.D. Ill. 1996) ("The use of
a credit card to incur debt in a typical credit card transaction involves no representation, express
or implied.").   The Fourth Circuit has issued an unpublished opinion holding that "[i]n the
context of credit cards, a cardholder's use of a credit card is treated as an implied representation
to the credit card company that the cardholder intends to repay the debt."   *Citibank (S.D.) N.A. v.
Parker*, 23 Fed. Appx. 125, 126 n.1 (4th Cir 2001) (per curiam).   The parties in this case agree
that the representation made was an intent or promise to repay the amounts charged, which
appears to be the better approach in credit card cases since a promise to repay is seemingly
inherent in any lending transaction because if there is no promise to repay, the transaction is a
gift instead of a loan.   *See Mercer*, 246 F.3d at 405-06.   Indeed, the wide body and disparity of
the case law in the credit card context suggests that an admonition one court made in 1986 has
come to fruition.   *See Faulk*, 69 B.R. at 752 ("Despite this fact there has been a growing body of
case law dealing with the use of credit cards some of which suggests that a determination of
dischargeability of credit cards is different than the dischargeability of other debts for alleged
false pretenses, false representations or actual fraud.").

   [11] While the making of a fraudulent misrepresentation and intent to deceive or to induce
reliance are separate and distinct elements, the reality is that a debtor who incurs charges with no
intent to repay them faces a difficult challenge in trying to argue he or she did not intend to
deceive or to induce reliance on the part of the credit card company.   *See Mercer*, 246 F.3d at
410 ("With card-use, and the concomitant representation of intent to pay, the cardholder's intent
is for the creditor, in reliance on that representation, to approve the requested loan.").

Pl.'s ex. 3, p. 4.

The next element that must be proven is whether Defendant's representation that she would repay the Contested Charges was fraudulent.  It is well-established that a broken promise, without more, is not fraud.  Rather, "[i]f, at the time [s]he made h[er] promise, [Defendant] did not intend to perform, then [s]he has made a false representation (false as to h[er] intent) and the debt that arose as a result thereof is not dischargeable (if the other elements of § 523(a)(2)(A) are met).  If [s]he did so intend at the time [s]he made [her] promise, but subsequently decided that [s]he could not or would not so perform, then h[er] initial representation was not false when made."  *Mills v. Hyman* (*In re Hyman*), 219 B.R. 699, 702 (Bankr. D.S.C. 1998) (quoting *Palmacci v. Umpierrez*, 121 F.3d 781, 787 (1st Cir. 1997)).  This concept is also found in the Restatement (Second) of Torts, which states under section 530 that "[a] representation of the maker's own intention to do or not to do a particular thing is fraudulent if he does not have that intention."  Because "[a] debtor rarely will admit card-debt is incurred with the intention of *not* paying it[,] . . . the creditor may rely on circumstantial evidence to prove the debtor's state of mind at card-use."  *Mercer*, 246 F.3d 391.  In determining whether a defendant's representation is fraudulent at the time a credit card is used to pay for a purchase, this Court examines the totality of the circumstances, including the following twelve factors:

> [1] the length of time between the charges and bankruptcy petition; [2] the number of charges made; [3] the amount of the charges; [4] whether charges were above the credit limit on the account; [5] whether there exists a sharp change in the debtor's buying habits; [6] whether there were multiple charges on the same day; [7] the financial sophistication of the debtor; [8] the financial condition of the debtor at the time the charges were made; [9] whether an attorney had been consulted about bankruptcy before the charges were made; [10] the debtor's employment circumstances; [11] the debtor's prospects for employment; and [12] whether the purchases were made for luxuries or necessities.

*First Card Serv., Inc. v. Team Motorsports, Inc.* (*In re Team Motorsports, Inc.*), 227 B.R. 427,

431 (Bankr. D.S.C. 1998). "These factors are nonexclusive; none is dispositive, nor must a

debtor's conduct satisfy a minimum number in order to prove fraudulent intent." *Am. Express*

*Travel Related Serv. Co. v. Hashemi* (*In re Hashemi*), 104 F.3d 1122, 1125 (9th Cir. 1997).

While in many instances a "consideration of these factors [is] helpful," they are to be considered

"together with any other facts and circumstances [the Court] may find proper, in determining

whether, at card-use, the debtor knew her representation was false." *Mercer*, 246 F.3d at 408.

After careful consideration of the evidence and testimony presented, the Court finds

Defendant has rebutted the presumption created by section 523(a)(2)(C) and finds Plaintiff has

not shown by the preponderance of the evidence that Defendant's promise to repay the Contested

Charges was fraudulent. Defendant testified that while the support she received from her

husband dwindled in 2011, she did not know about the client her husband lost until after making

the Contested Charges when she questioned him about the reduced support when discussing the

wedding expenses with him. Trial Tr. at 18, 22, 27, 29. Moreover, she testified she would not

have made the purchases for her sons at Jos. A. Bank if she had known about her husband losing

the client and his inability to reimburse her for the expenses but instead "would have told him to

handle it." *Id.* at 41-42. She also indicated she would not have bought the items she purchased

for herself if she had known about her husband's financial issues and his inability to continue

helping her the same way he had in the past. *Id.* Similarly, with respect to her use of her

Discover card to satisfy the $828.52 obligation Paxton owed to Anderson Brothers Bank, she

testified her husband was out of town at the time, which again suggests she would have told

Paxton to speak with his father about the obligation if his father were in town and believed her

husband would reimburse her for this expense. *Id.* at pp. 11-15. Plaintiff's counsel attempted to

impeach Defendant's testimony at trial regarding the support she received from her husband with her earlier deposition testimony. However, the Court does not find the deposition testimony read into the record at trial to be inconsistent with Defendant's trial testimony. Although Defendant could have clarified during her deposition the point in time when she first learned about her husband losing the client and the manner in which the support she received from him dwindled, Plaintiff's counsel also did not ask follow-up questions at the deposition seeking this information.

Other evidence supporting a finding that Defendant's representation was not fraudulent includes the fact that the only purchase she made with her Discover card after meeting with her bankruptcy counsel for the first time on September 30, 2011, was to obtain a credit report. During this same time period, she returned $636.00 in goods to the J. Peterman Co., applied a $100.00 cash bonus she received from Plaintiff toward her account balance, and made a $125.00 payment by phone on October 2, 2011. Pl.'s ex. 4. Defendant made other payments on her account during the months leading up to her bankruptcy filing that exceeded the minimum payment due. *Id.* Her Discover card statement with a closing date of October 5, 2011, reflects payments of $375.00, including the $125.00 payment by phone on October 2d, while the minimum payment due was only $109.00. *Id.* Her statement with a September 5, 2011 closing date shows a $299.00 credit for goods returned to the Peruvian Connection and a payment of $325.00 while the minimum payment due was $82.00. *Id.* Her statement with an August 5, 2011 closing date reflects $505.00 in payments while the minimum payment due was $78.00. *Id.* Her statement with a July 5, 2011 closing date reflects a $350.73 credit for goods returned to the J. Peterman Co. and a $125.00 payment while the minimum payment due was $86.00. *Id.* Finally, her statement with a June 5, 2011 closing date shows payments of $225.00 while the

18

minimum payment due was $80.00.  *Id.*  In addition to making payments that exceeded the minimum due and returning goods she purchased with her Discover card, Defendant testified she spoke with a long-time friend about lending her the money she needed to avoid filing bankruptcy, and this friend corroborated her testimony.  Trial Tr. pp. 47, 80-81.  None of this behavior suggests Defendant was seeking to defraud Plaintiff by incurring charges on her Discover card during the months prior to her bankruptcy while at the same time intending to avoid repaying the charges through filing bankruptcy.  Consequently, the Court finds the presumption rebutted and that Plaintiff has not met its burden of proof.

Plaintiff emphasized at trial the fact that according to her bankruptcy schedules, Defendant's expenses exceeded her income by approximately $400.00 before even taking into consideration the minimum $1,000.00 she spent servicing her credit card debt each month and the fact that she owed more than $39,000.00 in credit card debt even with the support her husband had been providing her.  However, "the hopeless state of a debtor's financial condition should never become a substitute for an actual finding of bad faith."  *Team Motorsports*, 227 B.R. at 431.  "The test for determining the debtor's intention to pay is not an objective standard of whether a reasonable person would have known there was an inability to pay but a subjective standard of an inability to pay."  *Id.*  Plaintiff also emphasized that between January 1st and July 6th of 2011, Defendant incurred charges of only approximately $445.00 on her Discover card but between July 7th and September 29th of 2011, she incurred charges of approximately $5,360.00, including the Contested Charges.  She then filed her bankruptcy petition on November 4, 2011. The Court has taken this fact into consideration but finds it outweighed by the factors and evidence that favor Defendant.

### 3. *Justifiable reliance*

"To satisfy the justifiable reliance element . . . , a plaintiff must show that it actually relied on the debtor's misrepresentations, and was justified in doing so because of 'the circumstances of the particular case.'" *SG Homes Assoc.*, 718 F.3d at 335 (quoting *Field*, 516 U.S. at 71); *see also* Restatement (Second) of Torts § 537 (1977) ("The recipient of a fraudulent misrepresentation can recover against its maker for pecuniary loss resulting from it if, but only if . . . (a) he relies on the misrepresentation in acting or refraining from action, and (b) his reliance is justifiable."). With respect to actual reliance, "[t]he recipient of a fraudulent misrepresentation can recover from the maker for his pecuniary loss only if he in fact relies upon the misrepresentation in acting or in refraining from action, and his reliance is a substantial factor in bringing about the loss." Restatement (Second) of Torts § 537 cmt. a. There is no evidence of actual reliance in the record before the Court. With respect to the transactions that compose the Contested Charges, there is nothing in the record regarding whether Plaintiff, on Defendant's behalf, paid or obligated itself to pay the various merchants for the goods purchased and Anderson Brothers Bank for the debt Defendant paid on Paxton's behalf. While Plaintiff probably could have proven actual reliance through a witness or some other method at trial, the Court will not attempt to guess why Plaintiff did not offer more evidence. The Court also will not make assumptions regarding how a credit card transaction works or how the particular transactions at issue were conducted and in doing so assume the existence of a material element in Plaintiff's case.

Even if the Court were to assume Plaintiff met its burden of proof with respect to actual reliance, the question remains as to whether that reliance was justified. Justifiable reliance "requires more than actual reliance but less than reasonable reliance." *Boyuka v. White* (*In re*

*White*), 128 Fed. Appx. 994, 999 (4th Cir. 2005).  To constitute justifiable reliance, a plaintiff's conduct does not have to "'conform to the standard of the reasonable man.  Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases.'" *Field*, 516 U.S. at 70-71 (quoting Restatement (Second) of Torts § 545A cmt. b).  Furthermore, "a person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'"  *Id*. at 70 (quoting Restatement (Second) of Torts § 540).  However, "a person is 'required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.'"  *Id*. at 71 (quoting Restatement (Second) of Torts § 541, cmt. a).  "Thus it is no defense to one who has made a fraudulent statement about his financial position that his offer to submit his books to examination is rejected.  On the other hand, if a mere cursory glance would have disclosed the falsity of the representation, its falsity is regarded as obvious" and the recipient of the misrepresentation is not justified in relying upon it.  Restatement (Second) of Torts § 540, cmt. a.  Specifically, in the context of a statement of intention, "[t]he recipient of a fraudulent misrepresentation of intention is justified in relying upon it if the existence of the intention is material and the recipient has reason to believe that it will be carried out."  *Id*., § 544; *see also id.*, § 544, cmt. c ("In order for reliance upon a statement of intention to be justifiable, the recipient of the statement must be justified in his expectation that the intention will be carried out.  If he knows facts that will make it impossible for the maker to do so, he cannot be justified in his reliance.").

Turning now to the evidence Plaintiff presented to show that it was justified in relying upon Defendant's promise to pay, Plaintiff introduced the application Defendant completed for

her Discover card.  Pl.'s ex. 2.  The application has a cover sheet that suggests the parties

obtained it from Plaintiff's records.  *Id*.  The application is dated March 29, 2004, and asks for

Defendant's social security number, date of birth, phone number, employer, occupation, and total

household income.  *Id*.  It also asks whether Defendant owns her home or rents and requests the

amount of Defendant's monthly housing payment.  *Id*.  While this application was admitted into

evidence without objection, there was no testimony regarding it.  In addition, no representative

from Plaintiff testified regarding whether this application was reviewed prior to Plaintiff issuing

Defendant a Discover card.  Indeed, there was no evidence at all of the analysis that went into

Plaintiff's decision to issue Defendant a credit card, which at the time of her bankruptcy filing

had a credit line of $11,800.00.

Other evidence that relates to justifiable reliance is the statements that were introduced

into evidence that reflect the activity on Defendant's Discover account during the year preceding

her bankruptcy.  Pl.'s ex. 4.  The Court has already described what is reflected in these

statements.  The only other evidence of justifiable reliance is the following colloquy between

Plaintiff's counsel and Defendant at trial:

> Q.       And you understood that Discover always expected you to pay for the
> charges you put on the card.
> A.       Of course.
> Q.       Exhibit 2, which I can show you if you need it, is your application for the
> card in - - from 2004 and is when you got that card.  Does that sound right to you?
> A.       I don't need to look at it.
> Q.       Okay.  And you always knew that Discover expected you to pay them
> back.
> A.       Of course. Yes.
> Q.       And you never gave Discover any reason to believe you would not pay for
> the charges.
> A.       No.

Trial Tr. pp. 37-38.  There was no testimony from Plaintiff regarding the significance to it of the

account history reflected in the statements for the year preceding Defendant's bankruptcy filing

or any of the other years during which Defendant had a Discover card, the analysis that went into continuing to allow Defendant access to a line of credit, and whether there was anything Plaintiff learned through sources available to it that indicated Defendant may not be able to repay the charges she was incurring.

While Plaintiff is correct in that the Fourth Circuit has described justifiable reliance as a "minimal threshold," *Biondo*, 180 F.3d at 135, the issue before the Court is whether this minimal threshold is crossed when a credit card application is introduced into evidence without any testimony as to whether Plaintiff reviewed it or the analysis that went into Plaintiff's decision to issue the line of credit, when the credit card statement from the last year of a line of credit that was in place for nine years is introduced into evidence without any testimony from Plaintiff regarding the significance of what is reflected in these statements on its decision to continue providing access to the line of credit, and when Defendant responds "no" when asked whether she ever gave Plaintiff any reason to believe she would not pay for the charges she incurred.  The Court finds that this minimal threshold is not crossed under these circumstances.  Considering there is no evidence of justifiable reliance other than that discussed here, it is as if Plaintiff wishes the Court to presume justifiable reliance from the absence of evidence to the contrary. This approach is inconsistent with Plaintiff's burden of proof, and a finding that justifiable reliance has not been proven is a risk inherent in Plaintiff proceeding by calling the opposing party as its only witness.  Simply stated, with the paucity of evidence before it, the Court is unable to find that Plaintiff was justified in relying on Defendant's promise to pay and not "blindly rel[ying] upon a misrepresentation the falsity of which would be patent to [it] if [it] had utilized [its] opportunity to make a cursory examination or investigation."  Restatement (Second) of Torts § 541, cmt. a; *see Holmes v. Nat'l City Bank* (*In re Holmes*), 414 B.R. 115, 123-26 (E.D.

Mich. 2009); *AT&T Universal Card Serv. Corp. v. Searle*, 223 B.R. 384, 392 (D. Mass. 1998);

*Columbo Bank, FSB v. Sharp* (*In re Sharp*), Nos. 02-21829 NVA, 02-19020 NVA, 2007 WL

2898704, at *4-*5 (Bankr. D. Md. Sept. 28, 2007); *Compass Bank v. Meyer* (*In re Meyer*), 296

B.R. 849, 861-63 (Bankr. N.D. Ala. 2003); *AT&T v. Herrig* (*In re Herrig*), 217 B.R. 891, 899-

900 (Bankr. N.D. Okla. 1998); *MBNA Am. v. Simos* (*In re Simos*), 209 B.R. 188, 193-94 (Bankr.

M.D.N.C. 1997); *AT&T Universal Card Serv. Corp. v. Akdogan* (*In re Akdogan*), 204 B.R. 90,

97 (Bankr. E.D.N.Y. 1997); *Sears, Roebuck & Co. v. Hernandez* (*In re Hernandez*), 208 B.R.

872, 877 (Bankr. N.D. Tex. 1997); *AT&T Universal Card Serv. Corp. v. Feld* (*In re Feld*), 203

B.R. 360, 371 (Bankr. E.D. Pa. 1996); *Chevy Chase, F.S.B. v. Pressgrove* (*In re Pressgrove*),

147 B.R. 244, 247 (Bankr. D. Kan. 1992).[12]  This conclusion is consistent with the reasoning of

the courts of appeal that have issued published opinions in cases where credit card companies

sought to have debts excepted from discharge under section 523(a)(2)(A).  The Ninth Circuit has

adopted a standard whereby "the credit card issuer justifiably relies on a representation of intent

to repay as long as the account is not in default and any initial investigations into a credit report

do not raise red flags that would make reliance unjustifiable."  *Anastas v. Am. Sav. Bank* (*In re

Anastas*), 94 F.3d 1280, 1286 (9th Cir. 1996) (citing *Citibank (S.D.), N.A. v. Eashai* (*In re

Eashai*), 87 F.3d 1082, 1091 (9th Cir. 1996)).  It seems logical that meeting this standard

includes showing what, if any, initial investigations were undertaken before card issuance and

---

[12] Plaintiff introduced no evidence regarding Defendant's solvency at the time it issued the credit card and whether the card it issued was pre-approved.  At least one treatise has questioned how a creditor can establish justifiable reliance when it issues "a pre-approved card to an already insolvent debtor without making any further inquiry into the debtor's financial condition."  4 *Collier on Bankruptcy* § 523.08[6] (16th ed.) ("Another significant consideration is whether the creditor issued a pre-approved card to an already insolvent debtor without making any further inquiry into the debtor's financial condition.  If so, the creditor cannot draw any adverse inferences from the debtor's use of the card while insolvent.  In such a case, it is also difficult to see how the creditor can establish its justifiable reliance on the debtor's representation.").

whether those investigations raised any red flags.  *See also AT&T Universal Card Serv. Corp. v. Burdge* (*In re Burdge*), 198 B.R. 773, 778 (B.A.P. 9th Cir. 1996) ("[I]f a creditor is aware of facts which, at a cursory glance, should alert that creditor to a possibility that the debtor either does not intend to pay for its debt or lacks the ability to pay its debt, the creditor must make reasonable inquiry before issuing the card or increasing the credit limit.").  The Fifth Circuit has adopted the Ninth Circuit's standard, and in doing so, cites favorably to *Searle*, *Herrig*, *Simos*, and *Feld*, all of which are decisions this Court finds persuasive in reaching its conclusion that Plaintiff has not met its burden of proof.  *Mercer*, 246 F.3d at 421-22.  Moreover, the Fifth Circuit stated evidence of a cardholder's history of payments with a card issuer will make justifiable reliance easier to prove but stopped short of saying it was conclusive evidence of justifiable reliance.  *Id.* at 424.  Finally, the Court's conclusion is also consistent with the Sixth Circuit's holding in *In re Ward* that "[a] lender must investigate creditworthiness and ferret out ordinary credit information," as there is no evidence such an investigation and ferreting occurred.  *Mfr. Hanover Trust Co. v. Ward* (*In re Ward*), 857 F.2d 1082, 1085-86 (6th Cir. 1988).  However, the Sixth Circuit applied a reasonable reliance standard in *Ward* and has not addressed the impact of the Supreme Court's adoption of a justifiable reliance standard on its reasoning in *Ward*, including whether ferreting out ordinary credit information is part of not blindly relying upon misrepresentations or runs afoul of the admonition that "a person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'"[13]  *Field*, 516 U.S. at 70 (quoting Restatement (Second) of Torts § 540); Restatement (Second) of Torts § 541, cmt. a.

---

[13]  The Court's decision is also consistent with the Eleventh Circuit's holding in *First Nat'l Bank of Mobile v. Roddenberry*, 701 F.2d 927, 932 (11th Cir. 1983).  However, the assumption of risk theory espoused in *Roddenberry* has been the subject of significant criticism.

*4. Remaining elements*

Because Plaintiff has not met its burden of proving Defendant's representations were fraudulent or that it actually or justifiably relied on the representations, the Court need not rule on the remaining elements of its section 523(a)(2)(A) claim.

## B. 11 U.S.C. § 523(d)

In response to Plaintiff's complaint, Defendant counterclaimed for her attorney fees and costs under 11 U.S.C. § 523(d), which provides:

> If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust.

"The purpose of [this] provision is to discourage creditors from initiating proceedings . . . in the hope of obtaining a settlement from an honest debtor anxious to save attorney's fees[, as] such practices impair the debtor's fresh start and are contrary to the spirit of the bankruptcy laws." S. Rep. No. 95-989, at 80 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5866. The Court has determined the debt at issue is dischargeable, and the parties agree the debt is "consumer debt" under 11 U.S.C. § 101(8). The remaining issues are whether Plaintiff's position was "substantially justified" and whether "special circumstances" make an award unjust. Plaintiff bears the burden of showing its position was substantially justified. *Bridgewater Credit Union v. McCarthy* (*In re McCarthy*), 243 B.R. 203, 208 (B.A.P. 1st Cir. 2000); *AT&T Universal Card Serv. Corp. v. Williams* (*In re Williams*), 224 B.R. 523, 529 (B.A.P. 2d Cir. 1998); *Am. Sav. Bank v Harvey* (*In re Harvey*), 172 B.R. 314, 317 (B.A.P. 9th Cir. 1994).

"Section 523(d) was patterned after the Equal Access to Justice Act ['EAJA'], 28 U.S.C. § 2412(d)(1)(A), a provision governing attorney's fees claimed by litigants against the federal

government." *McCarthy*, 243 B.R. at 207; *see also In re Hingson*, 954 F.2d 428, 429 (7th Cir. 1992); *Citizens Nat'l Bank v. Burns* (*In re Burns*), 894 F.2d 361, 363 n.2 (10th Cir 1990); *Williams*, 224 B.R. at 528; *In re Malone*, No. 10-02470-HB, 2011 WL 3800121, at *4 (Bankr. D.S.C. Aug. 29, 2011).   In *Pierce v. Underwood*, the Supreme Court rejected a definition of "substantial justification" as "'justified to a high degree'" in favor of "'justified in substance or in the main'—that is, justified to a degree that could satisfy a reasonable person."  487 U.S. 552, 565 (1988).   "To be 'substantially justified' means . . . more than merely undeserving of sanctions for frivolousness."  *Id.* at 566.  Moreover, "a position can be justified even though it is not correct, and . . . can be substantially (*i.e.,* for the most part) justified if a reasonable person could think it correct, that is, if it has a reasonable basis in law and fact."  *Id.* at 566 n.2.  With respect to the point in time in a litigation at which a plaintiff's position must be substantially justified, a plaintiff "must be substantially justified at all times through trial to be insulated from paying attorneys' fees under § 523(d)," not only at the time the complaint is filed.[14]  *Williams*, 224 B.R. at 530 (collecting cases); *McCarthy*, 243 B.R. at 210; *Harvey*, 172 B.R. at 319; *see also Roanoke River Basin Ass'n v. Hudson*, 991 F.2d 132, 138 (4th Cir. 1993) ("Moreover, it is clear that Congress intended to address governmental misconduct whether that conduct preceded litigation, compelling a private party to take legal action, or occurred in the context of an ongoing case through prosecution or defense of unreasonable positions.").   The fact that a

---

[14] However, the fact that a debtor is the prevailing party on a particular substantive issue in a litigation does not necessarily foreclose a creditor's position in a case as a whole from being substantially justified.  *Roanoke River Basin Ass'n v. Hudson*, 991 F.2d 132, 139 (4th Cir. 1993) ("We therefore conclude that, while a party may become a 'prevailing party' on a single substantive issue from which benefit is derived, satisfying one prong of the EAJA, it does not automatically follow that the government's position in the case as a whole is not substantially justified."); *see also Comm'r, Immigration & Naturalization Serv. v. Jean*, 496 U.S. 154, 161-62 (1990) ("Any given civil action can have numerous phases.  While the parties' postures on individual matters may be more or less justified, the EAJA-like other fee-shifting statutes-favors treating a case as an inclusive whole, rather than as atomized line-items.").

plaintiff did not attend the 11 U.S.C. § 341 meeting of creditors or conduct a Rule 2004 examination prior to filing an adversary proceeding is a factor that can be taken into consideration, but it is not dispositive of the issue. *McCarthy*, 243 B.R. at 209 n.6. A "bankruptcy court may, in most circumstances, reach its § 523(d) fee award determination without the necessity of an evidentiary hearing," as "[a] fees contest should not spawn a second lawsuit." *McCarthy*, 243 B.R. at 210 (citing *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)); *see also Williams*, 224 B.R. at 527 n.3.

While the opposing evidentiary showings at trial regarding whether Defendant's representation was fraudulent were close, there was no evidence regarding actual reliance and a severe lack of evidence with respect to justifiable reliance. As far as the Court knows, based on the record before it, Plaintiff never paid or obligated itself to pay Physicians Plan Weight Loss, Jos. A. Bank, Talbots, and Anderson Brothers Bank for the items purchased and the debt paid on Paxton's behalf and never reviewed Defendant's credit card application or engaged in any sort of analysis prior to extending Defendant a line of credit. The Court does not believe proving reliance, which is a "minimal standard," *Biondo*, 180 F.3d at 135, necessarily places an onerous burden on Plaintiff. Although other ways may exist to prove this element, Plaintiff probably could have met its burden of proof had it chosen to testify on its own behalf at trial. While the Court will not assume to know why more was not done to prove justifiable reliance, the Court also will not assume this element was proven in this case or that Plaintiff's position was substantially justified with respect to this element. In addition, Plaintiff cannot rely on the presumption created by section 523(a)(2)(C) as an explanation for the lack of evidence regarding reliance. Plaintiff filed no motion for summary judgment, and there was no request that Defendant be required to present evidence to overcome the presumption at trial before Plaintiff

presented its case.  Consequently, when Plaintiff presented its case, it had to proceed as if the presumption was rebutted and it had the burden of persuasion regarding all of the elements of its section 523(a)(2)(A) claim, which was its burden even with the presumption in place.

An additional reason exists for finding Plaintiff's position was not substantially justified. The initial complaint in this adversary contained no factual detail, aside from alleging the balance on Defendant's Discover account at the time she filed bankruptcy was $7,343.18 and Defendant incurred charges of $4,874.00 during the ninety days preceding her bankruptcy.  The complaint made no mention of "luxury goods" or the presumption created in section 523(a)(2)(C).  It also contained no detail regarding the nature of the goods purchased during the ninety days preceding Defendant's bankruptcy or even where the goods were purchased.  It made no reference to the information contained in Defendant's bankruptcy schedules.  There were no account statements or other information attached to the complaint.  Given the lack of factual allegations in the initial complaint that formed the basis for Plaintiff's position that the debt owed was nondischargeable, the Court finds Plaintiff's position was not substantially justified at the time it filed this case.

In support of its argument that its position was substantially justified at the time it filed this case, Plaintiff alluded in its pretrial memorandum of law to its amended complaint surviving a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  The amended complaint alleged some of the items purchased during the ninety days preceding Defendant's bankruptcy were luxury goods.  The amended complaint also referenced the charges Defendant, who is a woman, made at Jos. A. Bank, which is a men's clothing retailer, and the $119 purchase at J. Peterman Co.  Additionally, the amended complaint cited the charge at Anderson Brothers Bank, which was not listed as a creditor on Defendant's bankruptcy schedules, along with other

information contained in Defendant's schedules, including that her income was significantly less than her expenses and consisted of retirement and social security. However, Plaintiff's arguments ignore the initial complaint filed in this case and essentially ask that the Court treat the amended complaint as the initial complaint. The Court rejects this approach. The fact is the initial complaint contains no reference to luxury goods, Jos. A. Bank, J. Peterman, Anderson Brothers Bank, or Defendant's bankruptcy schedules. It was only after counsel for Defendant responded to the initial complaint with a motion to dismiss, which the Court granted with leave to amend, that Plaintiff added the references to Defendant's bankruptcy schedules, luxury goods, Jos. A. Bank, and J. Peterman included in its amended complaint. This sequence of events leads the Court to question whether Plaintiff was engaging in the very type of conduct Congress sought to proscribe through enacting section 523(d)—filing an adversary proceeding with little prelitigation investigation and with the objective of obtaining a quick settlement from or obtaining a default judgment against a financially-distressed debtor who is anxious to save on attorney fees. Based on Plaintiff's initial complaint, its only basis, at the time it filed this adversary proceeding, for seeking a determination it was owed a debt that is nondischargeable under section 523(a)(2) was that the balance on Defendant's Discover account at the time she filed bankruptcy was $7,343.18 and that Defendant incurred charges of $4,874.00 during the ninety days preceding her bankruptcy. Consequently, the Court finds Plaintiff's position was neither substantially justified at the time it filed this adversary proceeding nor during the presentation of its case.[15]

---

[15] The Fourth Circuit recently dealt with the issue in the EAJA context of whether an unreasonable prelitigation position forecloses a court from finding substantial justification. *United States v. 515 Granby, LLC*, -- F.3d --, 2013 WL 6085336 (4th Cir. 2013). The Fourth Circuit adopted "the view that an unreasonable prelitigation position will generally lead to an award of attorney's fees under the EAJA. If the government's position changes, the court must

The only remaining question is whether special circumstances make an award of fees and costs unjust. "The case law construing the term 'special circumstances' [is] sparse." *Parker v. Grant (In re Grant)*, 237 B.R. 97, 121 (Bankr. E.D. Va. 1999). One appellate court has stated the language regarding special circumstances in section 523(d) is not "a license to the bankruptcy judge to base decision on idiosyncratic notions of equity, fair dealing, or . . . family justice." *Hingson*, 954 F.2d at 429. Rather, "[t]he exception should be interpreted with reference to '*traditional* equitable principles.'" *Id.* at 429-30 (quoting *Oguachuba v. Immigration & Naturalization Serv.*, 706 F.2d 93, 98-99 (2d Cir.1983)). After considering the record before it, the Court does not find that special circumstances in this case make an award of fees and costs unjust.[16]

---

independently determine whether its prelitigation and litigation positions were reasonable. If the government's prelitigation position is unreasonable and its litigation position reasonable, the government must then prove that the unreasonable position did not 'force' the litigation or substantially alter the course of the litigation." *Id.* at *5. This Fourth Circuit decision involved a valuation dispute in the eminent domain context in which the government had a clear prelitigation valuation position. In the case before this Court, Plaintiff's prelitigation position, based on the initial complaint, was not substantially justified, and its position at trial also was not substantially justified.

[16] In its pretrial memorandum of law and at trial, Plaintiff argued the Court should bifurcate the issue of attorney fees under section 523(d) from the issue of whether the debt owed was nondischargeable and only consider the former after the latter determination was made. However, no motion to bifurcate was made prior to trial, and even if the Court were to bifurcate, there is no rule that the Court cannot conduct a hearing on both issues on the same day. Indeed, a "bankruptcy court may, in most circumstances, reach its § 523(d) fee award determination without the necessity of an evidentiary hearing," as "[a] fees contest should not spawn a second lawsuit." *McCarthy*, 243 B.R. at 210 (citing *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)); *see also Williams*, 224 B.R. at 527 n.3. While conducting a hearing to listen to arguments on the substantially justified issue may be helpful in some instances, conducting an evidentiary hearing during which a court considers evidence outside the record of the proceeding for which fees are sought runs the risk of turning what has been deemed to be an objective determination into an inquiry into a party's subjective reasons for initiating and continuing to litigate a case. Furthermore, in the EAJA context, Congress has specifically stated that "[w]hether or not the position of the United States was substantially justified shall be determined on the basis of the record (including the record with respect to the action or failure to act by the agency upon which

## <u>CONCLUSION</u>

For the reasons set forth herein, it is therefore ORDERED that:

1.     The debt Defendant owes to Plaintiff is dischargeable;

2.     Defendant is entitled to her reasonable attorney fees and costs under 11 U.S.C. § 523(d);

3.     Defendant shall have fourteen (14) days from the entry date of this Order to file her application for reasonable attorney fees and costs.  Plaintiff shall then have fourteen (14) days from the date the application is filed to submit objections to it; and

4.     Because section 523(d) states that "the court shall grant judgment in favor of the debtor" for its attorney fees and costs, the Court will withhold entering a judgment in this adversary proceeding until after making a determination regarding the amount of fees and costs.

AND IT IS SO ORDERED.

**FILED BY THE COURT**
**11/26/2013**



Entered: 11/26/2013

David R. Duncan
Chief US Bankruptcy Judge
District of South Carolina

---

the civil action is based) which is made in the civil action for which fees and other expenses are sought."  28 U.S.C. § 2412(d)(1)(B).